# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**United States of America,**

      **Plaintiff,**

**v.**                                                                        Case No. 10-20077-02-JWL
                                                                                   14-2475-JWL

**Samuel Barajas,**

      **Defendant.**

## MEMORANDUM & ORDER

In September 2011, defendant Samuel Barajas was convicted by a jury of conspiracy to distribute more than 500 grams of methamphetamine; aiding and abetting possession with intent to distribute 50 grams or more of methamphetamine; and using a communication facility (a cellular telephone) in committing, causing and facilitating the conspiracy. The court sentenced Mr. Barajas to life in prison. Mr. Barajas appealed the denial of his motion to suppress all evidence obtained from wiretap surveillance and GPS pinging of certain cell phones. The Tenth Circuit held on appeal that this court correctly denied the motion to suppress and affirmed this court's decision. After Mr. Barajas's petition for writ of certiorari was denied, he timely filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. In his petition, Mr. Barajas asserted a number of claims, including that his trial counsel provided ineffective assistance in connection with Mr. Barajas's decision to proceed to trial rather than enter a plea of guilty. Specifically, Mr. Barajas contended in his petition that his counsel failed to explain adequately the government's plea offer; failed to assess adequately the government's evidence against Mr. Barajas in the context of federal conspiracy laws; and failed to explain adequately the sentencing

consequences upon a conviction at trial. In his petition, Mr. Barajas asserted that his counsel's failures on these points caused Mr. Barajas to reject a favorable plea offer and proceed to trial to his detriment. The court granted Mr. Barajas's request for an evidentiary hearing on that claim, which it retained under advisement, appointed counsel for litigation of that claim, and dismissed the petition in all other respects.

On January 29, 2016, the court held an evidentiary hearing on the claim. Three witnesses testified at the hearing—Mr. Barajas's trial counsel, Paul Franco; Mr. Barajas; and Trent Krug, the Assistant United States Attorney who tried the case on behalf of the government and who otherwise worked on the case at all times relevant to Mr. Barajas's claim. The undisputed evidence presented at the hearing demonstrated that the government never extended a plea offer to Mr. Barajas in any respect such that his counsel's performance could not have caused him to reject a favorable plea offer. The claim asserted in Mr. Barajas's petition, then, must be denied. *See United States v. Nguyen*, 619 Fed. Appx. 136, 140-41 (3d Cir. 2015) (petitioner's claim that he rejected favorable plea offer based on counsel's deficient performance necessarily fails if plea agreement was never formally offered by the government). Nonetheless, in light of the evidence presented on behalf of Mr. Barajas at the hearing, the court construes Mr. Barajas at this juncture to assert two alternative claims—that Mr. Barajas's trial counsel lacked sufficient knowledge of the federal drug conspiracy laws and the Sentencing Guidelines such that he misinformed Mr. Barajas about his likelihood of success at trial and the consequences of a conviction at trial or, in the alternative, that Mr. Barajas's trial counsel in fact understood the federal drug conspiracy laws and the Sentencing Guidelines but failed to adequately explain the

law and the Guidelines to Mr. Barajas.[1] With respect to both claims, Mr. Barajas testified at the hearing that if his counsel had explained adequately the nature of federal drug conspiracy laws and the operation of the Sentencing Guidelines, he would not have proceeded to trial and would have certainly avoided a life sentence.

As explained in more detail below, the court concludes that Mr. Barajas's trial counsel provided adequate representation consistent with Mr. Barajas's Sixth Amendment rights. Specifically, the court concludes that trial counsel had the requisite knowledge of the federal drug conspiracy laws and the operation of the Sentencing Guidelines and that trial counsel imparted that knowledge to Mr. Barajas. The court further concludes that the representation provided by Mr. Barajas's trial counsel in no way prejudiced Mr. Barajas because Mr. Barajas would not have accepted a cooperation plea agreement with the government and would not have entered a straight plea to the conspiracy charge in lieu of proceeding to trial. Thus, the court now denies that portion of Mr. Barajas's § 2255 petition that it had previously retained under advisement.

*Standard*

Title 28 U.S.C. § 2255 entitles a prisoner to relief "[i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."

---

[1] The government did not object to Mr. Barajas's apparent expansion or modification of his claims at the hearing.

*Id*. The remedy under § 2255, then, does not encompass all claimed errors in conviction and sentencing; rather, the claimed error must constitute a "fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (quotations and citations omitted).

To obtain relief in the particular context of an ineffective assistance of counsel claim, Mr. Barajas must establish both that his counsel's performance was deficient and that he was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the performance prong, Mr. Barajas must overcome a "strong presumption that counsel's representation was within a wide range of reasonable professional assistance." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (internal quotations omitted). To overcome that presumption, he must show that counsel "failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal quotations omitted). In other words, Mr. Barajas must show that his counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *United States v. Rushin*, 642 F.3d 1299, 1307 (10th Cir. 2011) (quoting *Harrington*, 131 S. Ct. at 787).

With respect to the prejudice prong, Mr. Barajas must "demonstrate a 'reasonable probability' that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rushin*, 642 F.3d at 1309 (quoting *Harrington*, 131 S. Ct. at 787). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id*. at 1310 (quoting *Strickland*, 466 U.S. at 694). Confidence in the outcome is undermined only when "the likelihood of a different result is substantial, not just conceivable." *Id*.

*Background*

The following facts are either reflected from the docket in this case or from the testimony of witnesses at the evidentiary hearing. This case arises from a DEA investigation into a San Diego County, California based drug trafficking organization, involved in the importation, transportation, and distribution of large quantities of methamphetamine and cocaine from Mexico throughout the United States. As part of its investigation, DEA agents engaged in wiretap surveillance and GPS pinging of cell phones used by members of the organization. Using traditional investigative techniques, agents learned that an individual named Jesus Dominguez was a leader of the organization. Ultimately, agents obtained a wiretap of Mr. Dominguez's phone to further the investigation. Through that wiretap, agents intercepted several conversations between Mr. Dominguez and an individual named "Sammy" and later obtained a wiretap of Sammy's phone (Target Telephone 24).

Through wiretap surveillance and GPS pinging of Target Telephone 24 (TT No. 24), agents were able to frustrate the organization's attempt to send a courier to Kansas City. With the help of Kansas police, agents seized $69,800 from the courier's vehicle and more than 1 kilogram of methamphetamine from a residence in Kansas. Agents intercepted phone calls in which "Sammy" was heard discussing the seizure in Kansas. Shortly thereafter, agents obtained a wiretap for Target Telephone 26 based on their suspicions that "Sammy" was using another phone. On March 31, 2010, agents pinged TT No. 26, which showed the phone was located within a 5–meter radius of a specific residence in San Diego. On April 2, 2010, agents set up visual surveillance and observed a Toyota Camry entering the address. Agents followed the

5

Camry to a body shop, where they placed a call to TT No. 26. The driver of the Camry did not pick up the phone, but later returned the call to the agents. On April 28, 2010, agents again pinged TT No. 26, which revealed the phone was located within 11 meters of the same San Diego residence. The next day, agents pinged the phone and learned that it was located near a 24–Hour Fitness health club. Agents went to the location and found a champagne-colored Mercedes, a car they had seen at the San Diego residence, in the parking lot. Agents arrested Mr. Barajas when he exited the club and found TT No. 26 in his pocket.

On June 17, 2010, the government charged Mr. Barajas with conspiracy to distribute more than 500 grams of methamphetamine; aiding and abetting possession with intent to distribute 50 grams or more of methamphetamine; and using a communication facility (a cellular telephone) in committing, causing and facilitating the conspiracy. After the federal public defender filed a motion to suppress all evidence obtained through wiretap surveillance and GPS-pinging of TT Nos. 24 and 26, Mr. Barajas retained Paul Franco to represent him. As Mr. Franco explained at the evidentiary hearing, Mr. Barajas from the outset of Mr. Franco's representation, vigorously denied any wrongdoing. Despite Mr. Franco's efforts to convince Mr. Barajas to cooperate with the government, Mr. Barajas insisted that he had no information to share and had no knowledge of any person involved in drug-related activities. Mr. Franco advised Mr. Barajas that he could face a life sentence upon conviction at trial, but that he was more likely to receive a sentence around 25 years upon conviction. He suggested to Mr. Barajas that he could receive a much lesser sentence—roughly 10 years perhaps—if he cooperated with the government. Mr. Franco never discussed the option of entering a straight plea to the indictment because Mr. Barajas was insistent upon proceeding to trial to vindicate himself. For

his part, Mr. Barajas testified that he proceeded to trial because Mr. Franco indicated that the government had "no evidence" against him, because he is innocent and because Mr. Franco did not understand or did not explain to Mr. Barajas the nature of federal drug conspiracy laws and the operation of the Sentencing Guidelines.

In September 2011, Mr. Barajas was convicted by a jury on all counts in the indictment. After the jury's verdict, a presentence report was prepared. The PSR calculated a base offense level of 38 based on the quantity of methamphetamine attributed to Mr. Barajas (more than 1.5 kilograms of "Ice"). Mr. Barajas received a two-level enhancement under U.S.S.G. § 2D1.1(b)(5) because the offense involved the importation of methamphetamine and a four-level enhancement based on Mr. Barajas's role in the offense. With an adjusted offense level of 44 and a criminal history category of I, Mr. Barajas's advisory guidelines range was life.[2] In December 2011, the court sentenced Mr. Barajas to life in prison.

*Discussion*

The court begins its analysis of the evidence with the performance prong of *Strickland*—namely, whether Mr. Barajas has demonstrated that his counsel's performance was constitutionally deficient in that he lacked sufficient knowledge of the federal drug conspiracy laws and the Sentencing Guidelines such that he misinformed Mr. Barajas about his likelihood of success at trial and the consequences of a conviction at trial or, in the alternative, that Mr. Barajas's trial counsel in fact understood the federal drug conspiracy laws and the Sentencing

---

[2] Mr. Barajas's offense level was treated as a 43. *See* U.S.S.G. § 5A, application note 2 (an offense level of more than 43 is to be treated as an offense level of 43) (Nov. 1, 2011).

Guidelines but failed to adequately explain the law and the Guidelines to him. After hearing and weighing the evidence at the hearing, the court finds that Mr. Franco fully understood the nature of federal drug conspiracy laws and the Sentencing Guidelines in the context of this case and that he adequately explained the law and the Guidelines to Mr. Barajas. Mr. Barajas's claim, then, fails at the first prong of the *Strickland* test and must be denied.

The court is persuaded that Mr. Franco's performance in this case satisfied the guarantees of the Sixth Amendment. Mr. Franco testified that, at the time he agreed to represent Mr. Barajas, he had represented criminal defendants in federal drug cases in 10 to 20 cases. He testified credibly that he was familiar with the Sentencing Guidelines, including the application of relevant conduct as that concept relates to calculating drug amounts and enhancing a defendant's sentence. The evidence at the hearing demonstrated that Mr. Franco visited Mr. Barajas in CCA on eleven separate occasions and that each visit typically lasted for 45 minutes. Mr. Franco testified that he reviewed with Mr. Barajas the audio and transcripts of telephone calls between an individual named "Jesus" and an individual named ""Sammy" that were intercepted on the wiretap and potentially implicated Mr. Barajas in the conspiracy in that the government sought to prove that Mr. Barajas was the "Sammy" on the phone calls. The subject of the phone calls generally involved the transportation of paper and other items in cars that would not attract attention. Mr. Franco testified that he also reviewed a phone call with Mr. Barajas between "Sammy" and Luis Manzo-Barrios, a co-defendant in this case, in which the participants discussed "pigs getting into the corn" after a police search of a Prairie Village, Kansas residence uncovered 1.3 kilograms of methamphetamine. Mr. Franco testified that he explained to Mr. Barajas that the government contended that Jesus, Mr. Manzo-Barrios and

Sammy were speaking in code and that the government believed that Mr. Barajas was Sammy. According to Mr. Franco, he explained to Mr. Barajas that the government would use the conversation with Mr. Manzo-Barrios to attempt to connect Mr. Barajas to the 1.3 kilograms of methamphetamine.

The evidence also reveals that Mr. Franco showed Mr. Barajas a series of photographs that the government intended to use to identify Mr. Barajas at trial and to further connect Mr. Barajas to the conspiracy. Specifically, Mr. Franco testified that he advised Mr. Barajas that an agent would testify that Mr. Barajas was utilizing Target Telephone 26 just prior to the time that one particular photograph was taken. Mr. Franco testified that he advised Mr. Barajas that the photographs would be "very damaging" for Mr. Barajas if the government could connect the phone call to him. Contrary to an assertion in Mr. Barajas' affidavit, Mr. Franco credibly testified that he did not tell Mr. Barajas that the photo was irrelevant because it did not depict Mr. Barajas with the Target Telephone in his hand. Mr. Franco also advised Mr. Barajas that agents had made a phone call from Mr. Barajas's phone after he was in custody to a person in Prairie Village and that that evidence was also very damaging to Mr. Barajas. Mr. Franco attempted to impress upon Mr. Barajas that the government would attempt to coordinate the photographs with the phone calls.

According to Mr. Franco, Mr. Barajas, throughout the course of Mr. Franco's representation of him, steadfastly denied any involvement with any conspiracy. While Mr. Barajas acknowledged his identity in the photographs, he simply explained that he was "with his friends" but had no involvement in any drug-trafficking activities. Mr. Franco testified that he explained conspiracy law to him and that it was not necessary for Mr. Barajas to possess any

9

drugs at any time to be guilty of conspiracy. He explained to Mr. Barajas that he could be implicated in a conspiracy even if he was only trying to help someone else and even if he did not ask questions while he was helping that person. Mr. Franco testified that he believed that Mr. Barajas understood Mr. Franco's explanation of conspiracy law. Mr. Franco unequivocally testified that he reviewed the Guidelines with Mr. Barajas and advised him that he could get life under the Guidelines if they went to trial and lost. Significantly, this testimony is consistent with Mr. Barajas's own testimony—that Mr. Franco showed him "the chart" in the Guidelines and told him that he could get a life sentence. Both Mr. Franco and Mr. Barajas also testified that Mr. Franco advised Mr. Barajas that he did not believe that Mr. Barajas would get a life sentence because the Guidelines were advisory, Mr. Barajas was a "first time" offender, and he was young. According to Mr. Franco, he told Mr. Barajas that he believed that the worst case scenario was a sentence of "25 years or so" if convicted at trial.

As far as Mr. Barajas's chance of success at trial, Mr. Franco candidly testified that he told Mr. Barajas that he believed that they "had a pretty good chance" of prevailing at trial because the government's evidence connecting Mr. Barajas to the conspiracy was wholly circumstantial and required a fair amount of "connecting the dots." Mr. Franco advised Mr. Barajas that no witness at trial would testify to any direct contact with Mr. Barajas. However, Mr. Franco credibly denied making the statement, as alleged in Mr. Barajas's affidavit, that he ever advised Mr. Barajas that he had a "95% to 97% chance" of prevailing at trial and testified that he would "never" have made that estimate. In fact, because the government had evidence that Target Telephone 26 was in Mr. Barajas's pocket when he was arrested and that Mr. Barajas had $30,000 in currency in his residence when he was arrested, Mr. Franco strongly advised Mr.

10

Barajas not to proceed to trial and urged him to cooperate with the government in the hopes of obtaining a sentence in the range of 10 to 15 years. According to Mr. Franco, Mr. Barajas wanted to go to trial, maintained his innocence of any drug conspiracy and had no interest in cooperating with the government or entering a plea.

Mr. Franco also testified that he arranged a meeting with Mr. Krug, the case agent and Mr. Barajas in August 2011, about two weeks prior to trial. According to Mr. Franco, he wanted Mr. Barajas to see first hand the evidence that the government would put on at trial to link Mr. Barajas to the conspiracy even though Mr. Barajas insisted that he had done nothing wrong. Mr. Franco testified that his hope was that Mr. Barajas would hear and see the evidence and would be convinced that it was time to cooperate with the government so that he could help himself. After the meeting, Mr. Barajas continued to maintain his innocence and rejected any suggestion of cooperation. At the limine conference, Mr. Franco put on the record that it was "against [his] strongest advice" that Mr. Barajas was proceeding to trial but that it was Mr. Barajas's desire to do so. On the morning of trial, Mr. Franco again tried one last time to persuade Mr. Barajas to cooperate with the government although there was no specific offer from the government at that time.

Mr. Franco's testimony thoroughly convinces the court that he knew the risks faced by Mr. Barajas in light of the government's evidence, the pertinent law and the operation of the Guidelines and that he tried to impart that knowledge and those risks to Mr. Barajas.[3] Mr.

---

[3] While Mr. Franco may have made an erroneous prediction of Mr. Barajas's sentence upon conviction at trial, there is no evidence that this prediction was anything other than a good faith estimate that cannot rise to the level of deficient performance. *United States v. Gordon*, 4 F.3d 1567, 1570 (10th Cir. 1993). In any event, Mr. Barajas cannot establish any prejudice relating to

Barajas's testimony did nothing to convince the court otherwise. Mr. Barajas testified that, prior to trial, he did not "have an understanding of all—what all this meant and how it was going to be used against me." He testified that he decided to proceed to trial because Mr. Franco told him there was "no evidence" against him and Mr. Franco essentially told him that he could not plead guilty. This testimony is not credible because, although Mr. Barajas testified that he fully understands the evidence against him now and the strength of the government's case, he nonetheless continues to maintain his innocence, he testified at the hearing that he was not involved in a drug conspiracy, and he rejected an offer from the government prior to the start of the evidentiary hearing to resolve this matter. But Mr. Barajas also conceded that it was his voice on the audio recordings of the intercepted phone calls (although he testified that he "wasn't saying anything wrong") and that he was photographed with Mr. Manzo-Barrios. This strongly suggests to the court that Mr. Barajas, at all times, fully understood the nature of the case against him but was prepared to run the risk of a conviction at trial despite the consequences if he were unsuccessful in his attempt to be vindicated.

Even assuming trial counsel's performance was deficient in some respect for purposes of the Sixth Amendment, the court would nonetheless deny Mr. Barajas's claim because there is no showing of prejudice to Mr. Barajas. To establish *Strickland*'s prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

---

Mr. Franco's sentence prediction because, as explained more fully below, the evidence presented at the hearing clearly demonstrated that Mr. Barajas would never have accepted an offer from the government that required him to cooperate and would not have entered an open plea.

12

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the specific context of ineffective assistance in connection with plea negotiations, prejudice is demonstrated by showing "a reasonable probability that a plea offer would have been presented to the court . . ., that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).

The undisputed evidence at the hearing demonstrated that any informal plea discussions between the government and Mr. Franco contemplated Mr. Barajas's cooperation with the government. As explained by Mr. Krug, the government believed that Mr. Barajas had a "great deal of information" to share with the government and the government was anxious to tap into Mr. Barajas's knowledge concerning other individuals in the conspiracy. But the evidence at the hearing was also undisputed that Mr. Barajas would not cooperate with the government. Mr. Franco testified that he attempted to persuade Mr. Barajas to cooperate with the government during each visit he had with Mr. Barajas but that Mr. Barajas adamantly insisted that he had no information to share and that he knew "nothing" about any illegal activity. Mr. Barajas himself testified at the hearing that even now he has no information to provide to the government. According to Mr. Barajas, he himself has "never" been involved in any drug-related activities and he does not know anyone involved in any drug-related activities. He insisted in his testimony that he simply has "nothing" to offer the government. Because the evidence overwhelmingly demonstrates that Mr. Barajas has consistently and categorically rejected the idea of cooperating with the government, it is readily apparent that Mr. Barajas, even if fully advised by his trial counsel about his likelihood of success at trial and the consequences of a

conviction at trial, would have categorically rejected any plea offer that required cooperation. For the foregoing reasons, the court cannot find that a reasonable probability exists that Mr. Barajas would have entered a cooperation agreement with the government. Mr. Barajas, then, cannot demonstrate that Mr. Franco's performance in any way caused him to forego the opportunity to accept a cooperation agreement with the government. *See United States v. Martinez*, 359 Fed. Appx. 949, 951-52 (10th Cir. 2010) (district court, after evidentiary hearing, appropriately denied ineffective assistance claim based on counsel's allegedly inadequate advice about possible sentence upon conviction at trial; petitioner insisted on plea offer that included no prison time and, accordingly, district court concluded that petitioner would have rejected any plea offer that included a term of imprisonment).

Mr. Barajas testified at the hearing that if he knew that he was likely facing a life sentence upon conviction at trial, he would have "asked for a plea." Because it is clear that Mr. Barajas was not willing to cooperate with the government, the court assumes that Mr. Barajas meant that his counsel should have advised him to plead straight up to the indictment without the benefit of a plea agreement.[4] Mr. Barajas presumes that would have fared better than a life sentence with an open plea because he would have received the benefit of an acceptance-of-responsibility reduction. But Mr. Barajas put forth no evidence at the hearing demonstrating (or even remotely suggesting) that he would have entered a straight guilty plea. In fact, the evidence demonstrated that Mr. Barajas, throughout the process, was determined to proceed to trial.

---

[4] No evidence was presented at trial that the government would have considered or offered a non-cooperation plea agreement in the context of this case.

14

During the hearing, the government introduced transcripts of translated telephone conversations between Mr. Barajas and his wife that occurred between August 25, 2011 through September 8, 2011, the day of the jury's verdict. These conversations provide a great deal of insight into Mr. Barajas's thought process in the days prior to trial. On August 25, 2011, Mr. Barajas told his wife that Mr. Franco "wanted [him] to sign for 12 years." According to Mr. Barajas, he told his counsel "I am not signing for 12 years. I'm just going to go to trial and [expletive deleted]. I don't care if I get 30 and [expletive deleted]." During the same phone call, Mr. Barajas again explained to his wife that Mr. Franco "told me if I signed I could get 12 to 15 years. I told him [expletive deleted] that. You're crazy. I'm going to trial and that's it."

Mr. Barajas and his wife also spoke by telephone on August 29, 2011; September 2, 2011; and September 8, 2011. On each occasion, he told his wife that he refused to enter a guilty plea and, without question, wanted to proceed to trial. On August 29, he again told his wife that he had told Mr. Franco "I'm not going to sign for [expletive deleted] 12 years. He's crazy." As he stated to his wife, "Why would I do so many years? . . . . Why would I accept a charge that is not mine? If I had done something, honestly, I would." On September 2, Mr. Barajas summarized for his wife another conversation that he had had with Mr. Franco. As described by Mr. Barajas, Mr. Franco was "making" Mr. Barajas "sign for 10 years" but Mr. Barajas advised him that he "was going to trial." According to Mr. Barajas, Mr. Franco asked him at that point, "What do you want? Do you want to get 10 or do you want the 25 years?" Mr. Barajas told his wife that he told Mr. Franco, "I already told you what I want, I'm going to trial." On the day of the verdict, Mr. Barajas told his wife "I feel I'm innocent and since I have

15

always been innocent . . . that's why I went to trial." These are not the words of a defendant who might be open to the possibility of a straight plea.[5]

Mr. Barajas's statements are also consistent with his position in the affidavit he filed in support of his § 2255 petition and at the hearing. In his affidavit, Mr. Barajas stated that he had advised Mr. Franco during one of their visits that he was being charged "for someone else's crimes" and that he was only in the business of buying and selling cars. At the hearing, Mr. Barajas testified that he was not interested in pleading guilty because he was not involved with drugs. Similarly, Mr. Franco testified that Mr. Barajas's position, from the beginning of his representation of Mr. Barajas, was that he was innocent, he had done "nothing wrong," and that he was not part of any drug conspiracy. As aptly summarized by Mr. Franco, Mr. Barajas insisted on proceeding to trial because it was the only way for Mr. Barajas to vindicate himself. Mr. Kreug testified that Mr. Franco, on several occasions, advised Mr. Krug that Mr. Barajas was maintaining his innocence.

All of the evidence before the court, then, indicates that Mr. Barajas would not, under any circumstance, have entered a straight plea to the conspiracy charge in lieu of proceeding to trial.[6] His consistent denial of any involvement in any drug trafficking activities and his steadfast

---

[5] While Mr. Barajas at the hearing attempted to explain away these conversations by suggesting that he was simply trying to calm his wife, his explanation was not credible to the court. Mr. Barajas's statements to his wife over that roughly two-week period in 2011 are unambiguous and consistent. Moreover, to the extent Mr. Barajas asserted at the hearing that he was proclaiming his innocence at the time because he did not then understand the nature of a conspiracy due to counsel's failure to explain it to him, that explanation is similarly not credible because Mr. Barajas, even now when he admittedly understands the evidence against him and the significance of that evidence in terms of federal drug conspiracy laws, continues to assert that he was "not involved" in any drug-related activities.

[6] In fact, Mr. Barajas rejected an undisclosed offer from the government right before the hearing because it was "unfair" and "too much time."

16

refusal to consider a prison term of even 10 years precludes the court from finding that Mr. Barajas would have agreed to plead guilty without the benefit of a plea agreement. *See United States v. Allen*, 497 F.ed Appx. 853, 854 (10th Cir. 2012) (where petitioner maintained an "unwavering position of innocence" throughout case and gave no indication that she would have accepted a plea offer, prejudice is not established); *Holmes v.. United States*, 2015 WL 402957, at *10 (E.D. Va. Jan. 28, 2015) (no prejudice from counsel's alleged failure to advise defendant about ability to enter "straight up" plea of guilty where defendant consistently denied any wrongdoing); *Mann v. United States*, 66 F. Supp. 3d 728, 742 (E.D. Va. Dec. 4, 2014) (no prejudice from counsel's failure to advise defendant about ability to enter open plea where defendant still had not accepted full responsibility for crimes such that there was no record evidence supporting conclusion that defendant would have pled straight up to the indictment); *Diaz v. United States*, 2004 WL 5575163, at *12–13 (S.D. Fla. June 1, 2004) (no probability that defendant would have entered open plea where he continued to protest innocence on conspiracy charges).

Moreover, there is no evidence suggesting that the court would have given Mr. Barajas a reduction for acceptance of responsibility even if he had entered an open plea. *See United States v. Faubion*, 19 F.3d 226, 229 (5th Cir. 1994) (no harm shown by proceeding to trial rather than entering open plea; there is no cause-and-effect relationship between entering plea and receiving reduction for acceptance of responsibility); *United States v. Clark*, 2014 WL 2154677, *7 (E.D. Ky. May 22, 2014) (even if counsel failed to advise defendant about open plea option, no prejudice where defendant could not show that court would have given him credit for acceptance of responsibility). Without the acceptance of responsibility reduction, Mr. Barajas would still

17

have faced an advisory life sentence under the Guidelines. Similarly, because Mr. Barajas has steadfastly maintained his innocence throughout this process, there is no "reasonable probability" that he would have acknowledged his guilt in open court for purposes of entering a plea of guilty and, thus, he cannot establish that the court would have accepted a plea of guilty in this case. *United States v. Cooper*, 594 Fed. Appx. 509, 516 (10th Cir. 2014) (district court, after evidentiary hearing, appropriately denied petitioner ineffective assistance claim that he would have accepted plea if he had received competent advice; petitioner could not have acknowledged guilt in open court where he had adamantly proclaimed his innocence from indictment through appeal and at the hearing).[7]

For the foregoing reasons, there is simply no basis to conclude that a reasonable probability exists that Mr. Barajas would have entered an open plea or that an open plea would have resulted in a more favorable outcome for Mr. Barajas. Regardless of Mr. Franco's performance, then, the court would deny this claim on the prejudice prong of *Strickland*.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the portion of Mr. Barajas's motion to vacate under 28 U.S.C. § 2255 (doc. 115) that the court previously retained under advisement is now **denied.**

**IT IS SO ORDERED.**

---

[7] Assuming for the sake of argument that Mr. Barajas had entered a guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), he would have faced an advisory life sentence under the Guidelines because the same enhancements would have applied and he would not have received the benefit of the acceptance-of-responsibility reduction.

Dated this 4th day of February, 2016, at Kansas City, Kansas.

                                      s/ John W. Lungstrum
                                      John W. Lungstrum
                                      United States District Judge